BOARD OF EDUCATION *et al. v.* HON. ARTHUR P. HUDSON, *Judge, et al.*

(No. 7349)

Submitted May 13, 1932. Decided May 24, 1932.

*Price, Smith & Spilman,* and *Fitzpatrick, Brown & Davis,* for petitioners.

*T. C. Townsend, E. S. Bock,* and *Ben Moore,* for respondents.

HATCHER, PRESIDENT:

Ten subjects are required by law to be taught in the elementary schools, as follows: Reading, Spelling, Arithmetic, Geography, Physiology and Hygiene, History (United States and West Virginia), Civil Government, Language and Grammar, Agriculture, and Writing.

Code 1931, 18-2-10, provides in part as follows:

"By written request or otherwise the state board of education shall ask various publishers of textbooks in the United States to submit samples and

prices of textbooks on all subjects required to be taught in the schools of the State. * * * All bids shall be opened by the state board of education in executive session. After considering the subject matter, printing, binding, general suitableness and prices of books submitted, the board shall, on or before the first Tuesday in May, nineteen hundred and twenty-seven, and every fifth year thereafter, adopt one book, or one series of books, and only one, on each subject required to be taught in the elementary schools, * * * *Provided, however,* That not more than thirty per cent of the subjects required by law to be taught in the elementary schools shall be changed in any five-year adoption, unless further changes be necessary to protect the State against unfair prices or discrimination by the publishers of the books in use.''

At the regular book adoption for 1932, held by the board, it changed the textbooks in English (Language and Grammar), History, Reading and Civil Government. It claims to have made the first three changes under its unconditional right to change thirty per cent of the subjects, and to have made the change in Civil Government in order to protect the state against unfair prices on the textbooks in use.

At the instance of T. C. Townsend, who sues as Tax Commissioner, and on behalf of the citizens, etc., the circuit court of Kanawha county enjoined the consummation of contracts for all the new books adopted, under the following construction of the statute: ''The Court construes the language quoted to mean that the changes made by the board must first include the subject or subjects if any as to which such 'unfair price or discrimination', in the opinion of the board, exist, and if such subjects do not exceed thirty per cent of the total subjects taught then no changes beyond that limit may be made. The board may not under the statute first exhaust the thirty per cent limitation in making changes in subjects wherein such unfair prices do not prevail, and then proceed to make additional changes on account of alleged unfair prices.'' The board and the several publishers of the

new books adopted seek here the prohibition of further proceedings in the circuit court.

The board is purely a creation of the legislature and can act only within its delegated powers. If it has done so in this adoption, the court has no right to interfere; if not, judicial interference is warranted. So this case is primarily one of statutory interpretation. It is an established rule that statutes should be read "according to the natural and most obvious import of the language without resorting to subtle and forced constructions." 25 R. C. L., subject, Statutes, sec. 217. Consequently, we cannot accept the inverse procedure deduced by the circuit court. It is apparent that while the legislature meant that unfair prices should not be tolerated, it also intended that the quality of the textbooks should be maintained. In order to do so, price is simply one element of the five ("subject matter, printing, binding, general suitableness, and prices of books submitted") mentioned in the statute, and nothing whatever indicates that price is to be given paramount consideration in the adoption of books. Following the above rule, we read that at each five-year adoption, the board (a) shall secure samples and prices of textbooks in all the ten basic subjects required to be taught; it shall then (b) make comparisons of the several books submitted on each subject, taking into consideration the *five elements* above mentioned; from that comparison it shall (c) determine the advisability of changing any of the textbooks, being expressly limited to changes in thirty per cent of the subjects; and then it may (d) make "further" changes, if necessary, to protect the state from unfair prices or discrimination by the publishers of the books in use. In determining whether *further changes* shall be made (after changing thirty per cent), price and discrimination are the sole elements to be considered as to the books in use. We are not in accord as to just how unfair prices should be ascertained. We do agree, however, that the board was not governed solely by "unfair prices" in concluding to change the books in Civics.

There were two books in the course of Civics, one priced at $1.10 and the other at 69¢ under the 1927 adoption.

The first book was rebid in 1932 at $1.05 and the second at 69¢. The board says that during the period from 1927 to 1932, the costs of printing and publishing these two books have "greatly decreased", and contends that the rebid prices are therefore unfair. An examination of the prices of the books in the six subjects which were unchanged discloses several instances in which there were no changes in the 1927 and 1932 prices, viz: in Physiology and Hygiene the old price of "Journey to Health Land" was 62¢ and the new price is 62¢, and the old price of "Boys & Girls of Wake-Up Town" 65¢ and the new price 65¢; in Geography the old price of Atwood's "New Geography" was $1.72 and the new price $1.72; in Agriculture the old price of Benson & Betts "Agriculture" was $1.04 and the new price $1.04. The costs of printing and publishing the foregoing books have also *greatly decreased* (presumably in the same ratio as the costs of the books in Civics), yet the board did not treat the rebid prices of these books as unfair. Therefore, we must regard the explanation advanced ("unfair prices") for the change in Civics as superficial and look for deeper reasons. Such reasons appear both in the affidavits of the board members filed in the circuit court and in the allegations of the petition herein, namely, that in changing one of the books the board took into consideration "also the obsolete text of the book", and in changing the other it also considered "the suitableness, nature, arrangement and general fitness of said book." These considerations were proper in making the unconditional changes within the discretionary thirty per cent limitation, but they cannot be made the excuse for a further change under the *unfair price* provision. In other words, the board, being expressly limited by statute to thirty per cent discretionary changes cannot exercise its discretion in changing forty per cent of the subjects, and then charge the extra ten per cent to "unfair prices".

The minutes of the board show that on February 10th (1932) it asked R. Dennis Steed, Assistant Attorney General, if the law permitted a change in more than three subjects if "there was a much too high price bid for readoption";

that on February 11th, Mr. Steed reported he found no decision on the subject, but he thought a substantial difference in price might amount to an unfair price under the statute; that the board spent a large part of the forenoon of February 12th, "in a study and comparison of the contents and prices of all the books submitted for adoption in the subjects of first English, second History, third Readers and fourth Civics"; and at the afternoon session of February 12th, it made the changes in the order just named, giving as its reasons for changing the first three subjects, "the universal demand of school men and women throughout the state for changes in English, History and Readers, the superiority of the new texts in these subjects over the old antiquated and out-of-date texts now in use, (and) the much lower cost of the new texts in the above named subjects when compared with the cost of the old," and giving "unfair prices" as its reason for changing the books in Civics.

Had the board not thought it could change the texts in Civics under the *unfair price* provision, who can say that it would not have deemed such texts even more obsolete and more unsuitable than the books in one of the other three subjects? If so, we must presume that it would have included Civics in its thirty per cent discretionary changes and either English, Reading or History would not have been changed. The circuit court well found "there is no way to determine which three of the four subjects wherein changes were made would have been selected by the board, if it had placed proper construction on the unfair price provision." Despite the fact that Civics was the last change made, it appears (from the minutes quoted above) that the four changes were in fact considered together by the board and (from the petition herein and the affidavits of the board members) that substantially the same reasons prompted the changes in Civics as in the other three subjects, and (from the minutes again) that the changes were simultaneous and are not separable.

In prohibition, the petitioners must show a clear legal right to their demands. This they have not done. And since the

illegality of the change in Civics permeates the changes in the other three subjects, we are of opinion that the circuit court was warranted in forbidding the consummation of the contracts as to all the new books.

The right of the tax commissioner to maintain the suit in the circuit court is questioned. Code 1931, 18-5-21, provides that the district boards of education "may purchase" and furnish free to pupils the necessary textbooks for use in the free schools. We take judicial cognizance of the fact that there are a host of parents in the state this year who will be financially unable to purchase school books for their children. While the above statute is not mandatory but is merely permissive, the assumption is warranted that wherever feasible the district boards will undertake to meet the financial emergency and furnish books to indigent pupils. If so, the undertaking will involve the levy of taxes and the tax commissioner is properly interested under the general powers of his office relating to levies. See Code 1931, 11-1-2.

The writ is accordingly refused.

*Writ refused.*